UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
                                          USDC SDNY
                                          DOCUMENT
                                          ELECTRONICALLY FILED
                                          DOC #: _____
                                          DATE FILED: 3/2/2023
```

FELICIA BRAMBLE,

        Plaintiff,

 -against-

MOODY'S CORPORATION and SCOTT
KENNEY in his capacity as Senior Vice
President Chief Audit Executive and
ADAM BERKOWICZ in his capacity as
Senior Vice President of Accounting,

        Defendant.

No. 19 Civ. 5182 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

 Plaintiff Felicia Bramble ("Plaintiff" or "Bramble") commenced this action against Defendants Moody's Corporation ("Moody's"), Scott Kenney ("Kenney"), and Adam Berkowicz, ("Berkowicz") (collectively, "Defendants"), asserting claims for workplace discrimination. (Complaint ("Compl."), ECF No. 1.) Presently before the Court is Defendants' motion for summary judgment on all claims. For the following reasons, the Court GRANTS Defendants' motion for summary judgment.

## BACKGROUND

### I. Factual Background

 The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and the record and exhibits from discovery in the instant proceeding, which reflect the following factual background. All facts are undisputed unless otherwise noted.

 Moody's is a "global integrated risk assessment firm providing credit rating opinions, analytic solutions, and insights that empower organizations to make better, faster decisions."

1

(Defendants' Rule 56.1 Statement ("Defs. 56.1") at ¶ 1, ECF No. 39.)  Kenney, who is white, is currently the Senior Vice President of Risk Management and Chief Audit Executive at Moody's. (*Id.* at ¶¶ 2–3.)  Berkowicz, who is Hispanic,[1] serves as the Managing Director of Global Business Services at Moody's and previously served as Vice President then Senior Vice President of Accounting from 2008 through August 2021.  (*Id.* at ¶¶ 5–7.)  In his roles as Vice President and Senior Vice President, Berkowicz managed Moody's U.S. payroll function ("U.S. Payroll").  (*Id.* at ¶ 9.)  He was not responsible for managing global payroll functions, including the payroll function for Moody's operations in the United Kingdom ("U.K. Payroll").  (*Id.*)

Bramble, who is Black, was hired by Moody's in October 2003 to serve as a payroll analyst. (*Id.* at ¶¶ 12–13.)  Lisa Agostini ("Agostini") was Bramble's direct supervisor for the fifteen-year duration of Bramble's employment.  (*Id.* at ¶ 15.)  Agostini is also Black.  (*Id.* at ¶ 16.)  Berkowicz was Bramble's second-level supervisor from 2016 through her termination in 2018.  (*Id.* at ¶ 20.) Berkowicz and Bramble had a "good" working relationship.  (*Id.* at ¶ 21 (citing Bramble Tr. 26:4-11).)  Berkowicz thrice promoted Bramble, first to U.S. Payroll Manager, next to Senior Manager of U.S. Payroll, and last to Assistant Vice President of U.S. Payroll.  (*Id.* at ¶¶ 22–24.)  Berkowicz saw no issues with Bramble's work, and he rewarded her with multiple raises and promotions.  (*Id.* at ¶¶ 34–35.)  Bramble enjoyed working at Moody's and would still want to work there but-for her termination.  (*Id.* at ¶ 36.)

All of Moody's employees, including Bramble, are trained on how to recognize and report phishing and spam emails.  (*Id.* at ¶¶ 37–38.)  Moody's would send "test" emails to employees for training purposes; employees were expected to recognize and report these suspicious "test" emails.

---

[1] Berkowicz is the only person in the case with personal knowledge as to his race and heritage, and he has identified himself as Hispanic.  (Declaration of Adam Berkowicz at ¶ 3, ECF No. 41.)  Plaintiff has presented no competent evidence to rebut Berkowicz's declaration.

(*Id.* at ¶ 39.) On multiple occasions, Bramble clicked on the URL embedded in a test email, and each time she did so she was redirected to a page reminding her to review the sender and confirm whether the sender or sender's domain were familiar to Bramble. (*Id.* at ¶ 40–46.)

U.S. Payroll provides procedures for employees to change their direct deposit information. (*Id.* at ¶ 47.) Employees can change it themselves by accessing U.S. Payroll's self-service online portal. (*Id.*) They can also request assistance for the same from a U.S. Payroll employee. (*Id.* at ¶ 48.) When an employee requested a change to their direct deposit information, that change would be subject to an outside vendor's pre-verification, or "pre-note," process. (*Id.* at ¶¶ 49–51.) The outside vendor's pre-note process was not immediate; instead, an employee would need to wait a pay cycle to see the changes to their account. (*Id.* at ¶ 49.) If that employee wanted to change their information immediately, that employee needed to provide U.S. Payroll with a voided check to satisfy the expedited pre-note process. (*Id.* at ¶ 52.)

On July 23, 2018, Bramble received an email at her Moody's email address from an outside email address, admin@integr8data.com. (*Id.* at ¶ 53.) "Scott Kenney" was listed next to the email address in the "From" field. (*Id.*) The non-Moody's email address, admin@integr8data.com, was not Kenney's email address. (*Id.* at ¶ 54.) The email she received asked, "How do I go about changing my direct deposit from my payroll?" (*Id.* at ¶ 56.) Bramble directed the individual to submit their changes through the self-service online portal. (*Id.*) The individual, however, asked, "Can I just send you my new bank account details so you can get it done on your end," to which Bramble answered, "Sure you can." (*Id.* at ¶ 57.) The individual sent bank account details to Bramble and inquired as to when the new account would become active. (*Id.* at ¶ 58.) Bramble responded, "The new account will take effect with the 7/31 pay date." (*Id.*)

Bramble forwarded the email chain between herself and the outside email account to Sofia Krivorot ("Krivorot"), a Senior Payroll Administrator who reports directly to Bramble. (*Id.* at ¶ 59.) Bramble asked Krivorot to update Kenney's direct deposit information and instructed her to "not prenote." (*Id.*) Krivorot followed Bramble's instructions, updating Kenney's information without pre-verification. (*Id.* at ¶ 61.) Agostini verified the changes, though it was not her responsibility to verify the person sending the email was indeed Kenney—that responsibility fell to Bramble. (*Id.* at ¶¶ 63–64.)

A week later, Kenney did not receive his paycheck. (*Id.* at ¶ 66.) Kenney contacted Berkowicz to inquire into any payroll issues (*id.* at ¶ 67), which led Berkowicz to ask Bramble why Kenney had not received his pay (*id.* at ¶ 68). Bramble informed Berkowicz that she had recently processed an account change (*id.* at ¶ 69), and upon request, she forwarded her email chain with the outside email address to Berkowicz (*id.* at ¶ 70). Berkowicz informed Bramble the individual emailing from the outside email address was not Kenney. (*Id.* at ¶ 71.) Now aware the request for an account change was not from Kenney, Bramble notified Agostini, and U.S. Payroll subsequently stopped payment of Kenney's paycheck to the unverified bank account. (*Id.* at ¶ 72.) Berkowicz reported the incident to Moody's corporate security, which required reporting of any incidents in which an outside party sends an email requesting funds and those funds are transferred. (*Id.* at ¶ 74.)

A formal investigation followed. (*Id.* at ¶¶ 75–96.) During the investigation, Agostini confirmed the payroll team "knows and is trained that they can only remove the 'prenote' period if the employee provides documentation that the new account belongs to them." (*Id.* at ¶¶ 79–81.) According to Agostini, "[t]his is normally done by the employee providing the payroll department with a voided check or letter from their bank." (*Id.*) Bramble agreed. (*Id.* at ¶ 77–78.) She

4

explained to investigators that she "knew from the teams' internal process that she should have asked for a voided check or letter but she forgot to do so." (*Id.*) She conceded that she had "made a mistake and did not follow payroll's processes for verifying an employee's direct deposit information through a voided check or bank letter." (*Id.*) The investigation concluded that Bramble had likely violated the company's Code of Conduct. (*Id.* at ¶ 87.) The investigation report was sent to Human Resources, Berkowicz, and Acting Corporate Controller David Hogan to determine next steps. (*Id.* at ¶ 88.) Bramble was terminated. (*Id.* at ¶ 89.)

The company terminated Bramble for failing to following the company's internal processes and, in particular, directing her subordinate to do the same. (*Id.* at ¶¶ 89, 91) Bramble believes the company's proffered reasons for her termination were pretext for racial discrimination. (Plaintiff's Response to Defendants' Rule 56.1 Statement ("Plf. 56.1 Resp.") at ¶¶ 89, 91, ECF No. 50.) She believes she was treated differently because despite working for Moody's for fifteen years and receiving positive performance reviews—as well as multiple raises and promotions—she was terminated after only one incident. (Defs. 56.1 at ¶ 97.) Bramble can "only assume it's because she was Black." (*Id.*)

Aside from the process of her termination, Bramble cites examples from which she believes this Court can infer racial discrimination:

1. <u>Blackberry Service:</u>  In 2016, she received a Blackberry for work purposes, but when she received it her phone service was not activated. (*Id.* at ¶ 98.)
2. <u>Conversation with Berkowicz:</u>  In the fall of 2017, Berkowicz asked Bramble if she believed he had ever discriminated against her. (*Id.*) Bramble did not respond, and the conversation ended. (*Id.*)

3. <u>Promotion Announcements:</u>  Bramble was promoted within U.S. Payroll in 2012 and 2014, respectively.  (*Id.*)  Her promotion was not announced by the CFO.  (*Id.*)  In 2014, another employee in a different department was promoted, and the promotion was announced.  (*Id.*)

4. <u>Office Partition:</u>  Upon promotion to Assistant Vice President of U.S. Payroll, Bramble was assigned a new office.  (*Id.* at ¶ 113.)  Her new office had a partition, and her desk was set up behind it.  (*Id.* at ¶ 115.)  The desk's location behind the partition prevented others from seeing her as they were passing by the office.  (*Id.* at ¶ 98.)

5. <u>Salary Banding:</u>  In the fall of 2017, Berkowicz gave Bramble access to the company's salary banding information.  (*Id.*)  Bramble viewed her and Agostini's salary.  (*Id.*)  Bramble relayed this information to Agostini.  (*Id.*)  When Berkowicz learned Agostini received this information through Bramble, Berkowicz asked Human Resources to take away Bramble's access to the salary banding information.  (*Id.*)  Based on her review and recollection of the salary banding information, the only person Bramble recalls making more than her was Fady Benjamin.  (*Id.* at ¶ 121.)  At the time, Benjamin, who is Black, was Vice President of Accounting.  (*Id.* at ¶¶ 122–24.)  Her position was in a different department and two levels above Bramble, who was then Senior Manager of U.S. Payroll.  (*Id.* at ¶ 122.)

6. <u>U.K. Employee:</u>  Bramble and Agostini became aware of an incident in which an employee in Moody's London office received a phishing email and authorized a vendor account change.  (*Id.* at ¶¶ 134–36.)  That employee, however, was not disciplined.  (*Id.* at ¶¶ 134, 136)  Tim Herring, who had overseen that department at the time, did not recall the incident.  (*Id.* at ¶137.)

## II.       Procedural History

Plaintiff filed this action on June 3, 2019, alleging federal and state claims for workplace discrimination.  (ECF No. 1.)  Defendants filed the present motion for summary judgment on all claims.[2]

## LEGAL STANDARDS

## I.       Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment must be granted if "there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n. 4 (1986).  "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law."  *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotations and citations omitted).  In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment."  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party.  *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742

---

[2] All motions were fully briefed as of June 27, 2022.  (Defendants' Motion for Summary Judgment, ECF No. 37; Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs. Mem."), ECF No. 38; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plf. Opp."), ECF No. 49; Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("Defs. Reply"), ECF No. 54.)

(2d Cir. 1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citations omitted) (alteration in original).

## II.     Federal, State, and Municipal Workplace Discrimination Statutes

Title VII provides that an employer cannot discriminate against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). New York State Human Rights Law ("NYSHRL") "mirrors" these federal protections. *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 226 (2d Cir. 2014).

Courts analyze discrimination claims brought under Title VII and NYSHRL using the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (Title VII); *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (NYSHRL); *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75–76 (2d Cir. 2015) (NYCHRL).

Under the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case. 411 U.S. at 802. To establish a prima facie case of racial discrimination, a plaintiff must demonstrate that "(1) [they were] within the protected class; (2) [they were] qualified for the position; (3) [they were] subject to an adverse employment action; and (4) the adverse action

occurred under circumstances giving rise to an inference of discrimination." *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009).

The plaintiff's burden at this stage is "minimal" or "de minimis." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (describing burden for discrimination claims). However, a plaintiff must establish all four elements of the prima facie case before proceeding with the next step of the *McDonnell Douglas* framework. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311–12 (1996) ("As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption[.]'" (citations omitted)).

Once a plaintiff has made a prima facie case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. In other words, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks and emphasis omitted).

Upon the defendant's proffer of a non-discriminatory reason, the presumption of discrimination arising with the prima facie case "drops from the picture," *Weinstock*, 224 F.3d at 42 (citing *Hicks*, 509 U.S. at 510–11), and the "final and ultimate burden" then returns to the plaintiff to demonstrate that defendant's reason is in fact a pretext for unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 804; *Weinstock*, 224 F.3d at 42. The plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not the discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal

quotation marks omitted) (citation omitted). Alternatively, a plaintiff may meet its final burden by relying on direct or indirect evidence demonstrating that "an impermissible reason was a motivating factor, without proving that the employer's proffered explanation played no role in its conduct." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001) (internal quotations omitted). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock*, 224 F.3d at 42.

New York City Human Rights Law ("NYCHRL") is governed by more exacting standards. The NYCHRL long extended the same protections as its federal and state counterparts. *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 410 (2d Cir. 2015). In 2005, however, the New York City Council amended the NYCHRL, now requiring courts to undertake an analysis independent that of existing federal and state protections. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). District courts, however, continued "to apply federal standards to NYCHRL claims." *Id.* NYCHRL claims are now construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Id.* (citing *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)). As such, a plaintiff "need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." *Id. at* 110 (adding that the challenged conduct need not even be "tangible," like a "hiring or firing"). Put differently, "summary judgment is appropriate if the record establishes as a matter of law that discrimination

or retaliation played no role in the defendant's actions." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015) (internal citations and quotations omitted).

## DISCUSSION

Plaintiff alleges claims of racially disparate treatment under Title VII, NYSHRL, and NYCHRL. This Court first turns to Plaintiff's claims under Title VII and NYSHRL.[3]

### I.   Discrimination Claims under Title VII and NYSHRL

The Court first assesses whether Plaintiff has established a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiff alleges discrimination on the basis of her race. (*See generally* Compl.) The parties do not dispute whether Plaintiff was a member of a protected class, whether she was qualified for her job, or whether her termination constituted an "adverse action." Plaintiff's prima facie case hinges on whether the circumstances of her termination give rise to an inference of discrimination. *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009). To establish an inference of discrimination, a plaintiff may show they were "subjected" "to disparate treatment"—"that is," they were treated "less favorably than a similarly situated employee outside [plaintiff's] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) (holding that, to establish an inference of discrimination, a plaintiff and "similarly situated" employee need not be identically situated, but rather "similarly situated" in all "material" respects).

Plaintiff concedes "none of Defendants' actions *directly* indicate[] racial bias," but she argues she instead experienced racially disparate treatment. (Plf. Opp. at 7–8.) Plaintiff argues

---

[3] It is well-settled in the Second Circuit that "individuals are not subject to liability under Title VII." *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009). As such, this Court dismisses with prejudice Plaintiff's Title VII claims against Defendants Kenney and Berkowicz.

11

Moody's had a "policy of progressive discipline," "where prior to the last resort of termination employees would be given corrective actions to remediate performance deficiencies." (*Id.* at 8.) In effect, termination was "said to be the last option for employees who were given repeated chances to no avail." (*Id.*) Despite receiving positive performance reviews, raises, and promotions during her fifteen-year career at Moody's, Plaintiff was not "offered progressive discipline" "prior to her termination." (*Id.*) In this way, Plaintiff argues, Moody's treated Plaintiff differently than a Caucasian employee in Moody's London office who was not disciplined after failing to identify a phishing email and approving changes to a vendor's account without verification. (*Id.* at 8–9.)

Assuming Moody's has a progressive discipline policy—and it is not clear it does—Plaintiff admits Moody's is not *required* to use progressive discipline prior to termination, especially where "poor performance, bad behavior, or [a] policy violation is severe enough." (Plf. 56.1 Resp. at ¶¶ 93–94.) Plaintiff likewise admits she "made a mistake and did not follow payroll's processes for verifying an employee's direct deposit information through a voided check or bank letter." (*Id.* at ¶ 78.) Although Plaintiff admits she made a mistake, she believes it was not severe enough to warrant termination. (*Id.* at ¶¶ 93–94.) To show her mistake was not severe enough to warrant termination, Plaintiff points to an incident she learned of involving an employee in Moody's London office who allegedly made a similar mistake and was not disciplined. (Plf. Opp. at 8–9 (citing Declaration of Felicia Bramble ("Bramble Dec.") at ¶ 12, ECF No. 51 and Declaration of Lisa Agostini ("Agostini Dec.") at ¶¶ 25, 27, 35, ECF No. 53).) Plaintiff, however, relies exclusively on conversations she and Agostini had with employees in the London office—inadmissible hearsay, *see Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) ("We need not consider such evidence because [plaintiff] cannot rely on inadmissible hearsay in opposing a motion for summary judgment.")—to prove the incident

12

occurred, and even then, Plaintiff cannot identify any details, such as the name or position of the employee. *See Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 580 (S.D.N.Y. 2013) ("Employment characteristics which can support a finding that two employees are similarly situated include similarities in education, seniority, performance, and specific work duties, and similar requirements for skill, effort and responsibility for jobs performed under similar working conditions.") (internal citations and quotations omitted). Nor does Plaintiff demonstrate that she and the London employee worked in the same department, or if that department was subject to the same internal policies and procedures and governed by similar employment laws and regulations. *See Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465–66 (S.D.N.Y. 2006) (collecting cases) ("In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated."). In fact, Plaintiff admits she cannot identify another U.S. Payroll employee "who received a fraudulent email requesting to change their direct deposit information to a new account, failed to confirm the identity of the individual sending the email, and directed a subordinate to not follow internal procedures, which resulted in a Moody's employee not receiving their paycheck." (Plf. 56.1 Resp. at ¶ 141.) As such, Plaintiff has not produced sufficient evidence that "similarly situated individuals outside of her protected class" were subject to lesser punishment. *E.g., Perkins v. United States Dep't of the Treasury*, No. 18-CV-08911, 2022 WL 19772, at *6 (S.D.N.Y. Jan. 3, 2022) (granting summary judgment on discrimination claim because plaintiff failed to show similarly situated employees were similarly situated in "all material respects").

Plaintiff also believes the following prior incidents "give rise to an inference of racial discrimination" in the circumstances "surrounding her termination": (1) Plaintiff's phone service

was "shut off" by Berkowicz while two Caucasian employees "did not lose their phone service"; (2) Berkowicz "asked Plaintiff prior to her termination if [she] believed he discriminated against her"; (3) Berkowicz reassigned Plaintiff to an office with a partition, behind which "no one could see her"; (4) the promotions of "Caucasian employees" were announced "in finance meetings," but Plaintiff's promotions never were; and (5) Plaintiff's access to salary banding information was revoked by Human Resources, though not before Plaintiff was able to see she made less than "similarly-situated Caucasian employees." (Plf. Opp. at 9–10.)

These incidents do not show racial discrimination played any role in Plaintiff's termination. First, Plaintiff admits a Black co-worker had phone service (Plf. 56.1 Resp. at ¶¶ 103, 106), and she further admits that the other individuals who she identified as receiving phone service had different titles, were not the same seniority level, and did not perform the same job duties. (*Id.* at ¶¶ 103, 107–110.) Plaintiff is not similarly situated to these employees. *See Potash*, 972 F. Supp. 2d at 580. Second, Berkowicz asked his question about discrimination to Plaintiff over a year before her termination. *See Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004) (considering "when the [allegedly discriminatory] remark was made in relation to the employment decision at issue," "the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory," and "the context in which the remark was made, i.e., whether it was related to the decisionmaking process"). Berkowicz posed his question outside of the context of the decision-making process behind Plaintiff's termination, and Plaintiff interpreted the question as "weird," not reflective of racial animus (Defs. 56.1 at ¶ 98). *Id.* Third, Plaintiff produces no evidence to suggest race motivated her office reassignment. Instead, she admits that she was reassigned to her own office when she was promoted to Assistant Vice President. (Plf. 56.1 Resp. at ¶ 113.) Moreover, she admits she was not instructed to sit behind the partition. (*Id.* at ¶ 115.)

14

Although she believes other "similarly situated Caucasians were visible to co-workers" (Plf. Opp. at 9), she does not explain how these employees were similarly-situated to her, such as if they too were Vice Presidents of U.S. Payroll and may have required privacy to address confidential employee compensation information (Defs. 56.1 at ¶ 114). *See Potash*, 972 F. Supp. 2d at 580. Fourth, Plaintiff is not similarly situated to the employee who received a promotion that was later announced by the company's CFO. *See id.* Plaintiff and the employee she identifies do not share the same position or work in the same department (Plf. 56.1 Resp. at ¶¶ 135–36), and the record suggests the employee was not promoted but rather resigned and was rehired (*see* Declaration of Lauren Kiesel at ¶ 11, ECF No. 47). And fifth, Plaintiff identifies only one employee who had a higher salary than her, but that employee held a more senior position, was in a different department, and is also Black. (Defs. 56.1 at ¶¶ 121–124.) In sum, Plaintiff fails to meet her prima facie case. She has not produced sufficient evidence to establish an inference of discrimination, such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to [plaintiff's termination]." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).

Accordingly, Plaintiff's claims under Title VII and NYSHRL are dismissed with prejudice.

The Court now turns to Plaintiff's claims under NYCHRL.

## II.   Discrimination Claims under NYCHRL

As stated above, "summary judgment is appropriate if the record establishes as a matter of law that discrimination or retaliation played no role in the defendant's actions." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015) (internal citations and quotations omitted).

For the reasons described above, Plaintiff has failed to put forth sufficient evidence to create a genuine issue of fact that discrimination played any role in Defendants' actions.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.

Plaintiff's claims are dismissed with prejudice.

The Clerk of Court is kindly directed to terminate the motion at ECF No. 37. The Clerk of Court is also directed to enter judgment in favor of the Defendants. The Clerk of Court is further directed to close the case.

Dated: March 2, 2023         SO ORDERED:
       White Plains, New York

                                                                NELSON S. ROMÁN
                                              United States District Judge